[No. G014218. Fourth Dist., Div. Three. Dec. 30, 1993.]

DAWN DUNN, Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## COUNSEL

Stokke & Riddet, Allan H. Stokke and William J. Kopeny for Petitioner.

No appearance for Respondent.

Michael R. Capizzi, District Attorneys, Maurice L. Evans, Chief Assistant District Attorney, and Gregg L. Prickett, Deputy District Attorney, for Real Party in Interest.

## OPINION

WALLIN, J.—Dawn Dunn petitions for a writ of prohibition/mandate to challenge an order compelling her to testify against her husband in grand

jury proceedings,[1] contending she can invoke the marital privilege against such testimony. We deny the writ.

Dunn was subpoenaed to testify before the grand jury concerning an investigation as to whether her husband killed foster child Eric Dawson, who resided with the Dunns. She appeared before the superior court and invoked the marital privilege not to testify against her husband.[2] The superior court found applicable the marital privilege exception for crimes committed against a child of the husband or wife, contained in section 972, subdivision (e)(1), and ordered Dunn to testify.

 Section 972 provides in relevant part: "A married person does not have a privilege under this article in . . . [a] criminal proceeding in which one spouse is charged with . . . [a] crime against the person or property of the other spouse or of a child, parent, relative or cohabitant of either, whether committed before or during marriage."[3] Dunn contends foster child Eric Dawson was neither a "child" nor a "cohabitant" of either her or her husband.

We have found no California case dealing with whether a foster child is a "child" for purposes of applying the privilege, and the legislative history of the statute is silent on the issue. However, in *People v. McGraw* (1983) 141 Cal.App.3d 618 [190 Cal.Rptr. 461], the court held the term applied to an adult stepchild of the defendant, in the context of an exemption to the analogous privilege for confidential marital communications contained in section 985. (141 Cal.App.3d at p. 622.)[4]

In reaching that conclusion the court observed the purpose behind the privilege "is to preserve confidence and marital harmony between the spouses. [Citations.] [The exemption] is grounded on the self-evident premise that marital harmony would be nonexistent in criminal actions

[1] The only "order" contained in the court's minutes is for Dunn to "appear before the Grand Jury . . . ." There is also a finding that "a child is covered by 972 (e)(1) E.C. and that a foster child is included within 972(e)(1) E.C. Therefore [*sic*] the exception to this privilege applies and therefore the privilege does not apply." Dunn apparently construes this as an order compelling her to testify before the grand jury, and the district attorney voices no opposition to this construction. We will adopt it.

[2] Evidence Code section 970 states, "Except as otherwise provided by statute, a married person has a privilege not to testify against his spouse in any proceeding." All statutory references are to the Evidence Code unless otherwise stated.

[3] Section 972 states exceptions to the general privilege created by sections 970 and 971.

[4] Because the purpose of the privileges is the same and the exceptions are substantially similar, cases dealing with one are appropriate for consideration when interpreting the other. (See, e.g., *Fortes v. Municipal Court* (1980) 113 Cal.App.3d 704, 709, fn. 4 [170 Cal.Rptr. 292].)

where a child of either spouse is the victim of a crime committed by one of the spouses." (141 Cal.App.3d at p. 622.)

The same reasoning applies when the child is a foster child. Many foster parents develop close, loving personal relationships with their charges. (See, e.g., *In re Rodrigo S.* (1990) 225 Cal.App.3d 1179, 1184-1185 [276 Cal.Rptr. 183].) In those instances, injury to the child caused by the other spouse would be harmful to the marriage. That the child is not biologically related to either parent distinguishes it from the converse situation only as a matter of degree.

A similar analysis applies even if one adopts the rather cynical assumption that foster parents view the relationship as no more than a business deal. Here, for example, the Dunns consented by written agreement to provide good care for 19-month-old Eric Dawson, and to refrain from inflicting "CORPORAL/HUMILIATING PUNISHMENT denying child's rights [*sic*]." One spouse's breach of this provision by killing the child certainly would not be conducive to optimum marital harmony.[5]

Two out-of-state cases interpreting similar marital privilege found that foster children were included as children under the exception. In *State* v. *Michels* (1987) 141 Wis.2d 81 [414 N.W.2d 311], the court found the term "child of either" was ambiguous and looked to the legislative intent. The purpose of the exception was to allow prosecution for crimes which occurred within the family unit and might go unprosecuted when the spouse was the only witness. The court found there was no reason to distinguish between biological children and foster children for this purpose, at least where the child had sufficient ties to the family unit. (*Id.* at p. 94 [414 N.W.2d at p. 316].)

The California exceptions to the marital privilege have a similar purpose. Penal Code section 1322, the predecessor to the Evidence Code sections, provided an exception "in cases of criminal violence upon one [spouse] by the other, or upon the child or children of one by the other . . . ." (Stats. 1933, ch. 109, § 1, p. 565.) The language connotes an intent to protect society from crimes against family members. In the Evidence Code, the language was expanded to apply the exemption to "a child . . . of either." As in *Michels*, we see no reason to exclude foster children from this definition, as it is consistent with the general legislative intent. (See *California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836].)

[5]Dunn points out that marital harmony was not affected here and her assertion of the privilege demonstrates it. But, that argument proves too much. When the privilege is not asserted, the exception is unnecessary. Conversely, if the mere assertion of the privilege negated the exception, the latter would serve no purpose. In this respect, privilege cases must be considered in the abstract.

The *Michels* court found the child, who had lived with the family for 10 years, had sufficient ties to the family unit to justify application of the exception. (*State* v. *Michels, supra,* 141 Wis.2d at p. 94 [414 N.W.2d at p. 316].) Eric Dawson had lived with the Dunns for five months before his death. No direct evidence of his "ties" to the family is in the record. However, he had lived there three months longer than the written agreement required.

In any event, the child's length of residence should not be the determinative factor. Where the foster parents have entered into a formal agreement to provide a home for the child, they have established a relationship sufficient for invocation of the exception.

In *Daniels* v. *State* (Alaska Ct.App. 1984) 681 P.2d 341 the court also found a foster child was a "child of either" spouse under a statutory scheme similar to California's. In doing so, the court found the policy against child abuse justified construing the marital privilege narrowly. (*Id.* at p. 345.)[6] California law dictates a similar result.

The Legislature has enacted a comprehensive program for foster placement. (Health & Saf. Code, § 1500 et seq.) It provides for training for foster parents "to assist them in being effective substitute caregivers and to enhance the safety and growth of children placed with them." (Health & Saf. Code, § 1529.1.) Foster home licensees are subject to a Child Abuse Registry investigation. (Health & Saf. Code, § 1522.1.) In enacting these provisions, the Legislature evidenced an intent to protect children in foster care. Allowing the marital privilege to act as a shield for those foster parents who abuse or kill foster children would be at odds with that intent.

Dunn argues we should not consider the state's interest in protecting children because it is at odds with its interest in preserving a marriage, at least when the spouses are not related to the child. She cites no authority for this proposition, and it is not compelled by logic. We often deal with competing interests which arise from disparate sources. Here, the interest in protecting children, which abounds in the law, is paramount.

 Our construction of the exception to include foster children is consistent with the courts' policy to construe privileges narrowly "since they

---

[6]The *Daniels* court acknowledged the court in *People* v. *Clark* (1962) 366 Mich. 209 [114 N.W.2d 338] had reached a contrary result under similar facts. But the *Daniels* court aptly noted *Clark* was not recent authority and dealt with Michigan law which at the time provided, among other things, that a wife could not swear out a criminal complaint against her husband without his consent. (*Daniels* v. *State, supra,* 681 P.2d at p. 343.) Like the *Daniels* court, we do not deal with such archaic legislation.

prevent the admission of relevant and otherwise admissible evidence. Professor McCormick points out that, 'all privileges . . . are inept and clumsy devices to promote the policies they profess to serve, but are extremely effective as stumbling blocks to obstruct the attainment of justice. Accordingly, the movement should be toward restriction and not toward expansion, of these mechanisms for concealment of relevant facts.' [Citation.]" (*People v. McGraw, supra*, 141 Cal.App.3d at p. 622; see also *People v. Delph* (1979) 94 Cal.App.3d 411, 415-416 [156 Cal.Rptr. 422, 4 A.L.R.4th 416].)

Because we conclude a foster child is a "child" under section 972, we need not determine whether such a child is also a "cohabitant." However, *People v. Siravo* (1993) 17 Cal.App.4th 555 [21 Cal.Rptr.2d 350] defined the latter term broadly enough to include foster children. (*Id.* at p. 561.) There, the defendant raped his estranged wife's roommate. The Court of Appeal rejected Siravo's argument, the same one Dunn makes here, that "cohabitation" implies sexual relations between cohabitants. It concluded "that a cohabitant is someone who lives together with another," pointing out that this definition is consistent with the meaning given to the term in related contexts and nothing in the legislative history of the Evidence Code sections was contrary to the definition adopted by the court. (*Id.* at pp. 561-562.)[7]

Dunn launches several attacks on *Siravo*. He urges: (1) the construction of "cohabitant" is dictum; (2) the court speculated as to what the Legislature intended by the term; (3) the interpretation of the term's "ordinary meaning" is flawed; and (4) the analysis of how "cohabitant" is used in the other statutes is selective. Although our holding is not based upon the meaning of "cohabitant," we make some observations about Dunn's arguments.

In *Siravo* the construction of "cohabitant" was not dictum. Although the court found the admission of the wife's testimony was harmless, it did so in one paragraph, after devoting three pages to a definition of "cohabitant." The analysis was relevant to the material facts before the court, and does not appear to have been intended merely as a method of passing time until the court reached a one-paragraph tag line on harmless error. (See *United Steelworkers of America* v. *Board of Education* (1984) 162 Cal.App.3d 823, 834 [209 Cal.Rptr. 16].)

---

[7]Dunn refers to Penal Code sections 273.5 (infliction of corporal injury on a spouse or cohabitant) and 281 (defining bigamy as involving a second marriage and "proof of cohabitation") in support of her claim that sexual relations are required. She cites no authority construing the term that way in these sections. *People v. Holifield* (1988) 205 Cal.App.3d 993 [252 Cal.Rptr. 729] held that sexual relations were not required for cohabiting under section 273.5, although the statute required a man and a woman to have more than a platonic relationship. (205 Cal.App.3d at p. 999.) Even if the term required sexual relations, it does not necessarily follow it must have the same meaning in the Evidence Code.

However, Dunn may have a valid point that the *Siravo* court erred analytically when it concluded the ordinary or plain meaning of "cohabit" was simply to live together. The court reached that conclusion by noting that living together was a common element in all definitions of the word. But, as Dunn correctly notes, a common thread running through all definitions of a word is not automatically the plain meaning of the word.

The first definition of "cohabit" in the dictionary involves living together as man and wife, usually without marriage. (*People v. Siravo, supra,* 17 Cal.App.4th at p. 561.) However, Dunn is wrong to assert the common meaning of a word is always the first meaning given in the dictionary, at least for purposes of statutory construction. As Dunn and the *Siravo* court point out, the Legislature has used the term differently in various contexts, sometimes to connote living together as husband and wife, and sometimes to connote simply living together. (*Ibid.*)[8]

Thus, the meaning of "cohabit" is not as plain as the *Siravo* court appears to suggest. However, this does not mean the court's interpretation of the term was incorrect. When words in a statute are ambiguous, the court must look to legislative intent to discern their meaning. (*California Mfrs. Assn.* v. *Public Utilities Com., supra,* 24 Cal.3d 836, 844.)[9]

The 1986 legislation that added "parent, relative, or cohabitant" to section 972 was part of legislation which dealt with the topic of domestic violence and abuse, primarily in the context of elder and dependent adults. (*People v. Siravo, supra,* 17 Cal.App.4th at p. 562.) Under these circumstances a court can reasonably conclude the Legislature intended a broad reading of the term "cohabitant," especially since it was presumably aware of the courts' traditionally narrow application of privileges (*People v. Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288]), but did not add any limiting words to the term. (Cf. Pen. Code, § 273.5, requiring a "significant relationship" between cohabitants; *People v. Holifield, supra,* 205 Cal.App.3d at p. 998.) Thus, contrary to Dunn's argument, the *Siravo* court did not speculate any more about the Legislature's intended meaning of

---

[8]Dunn correctly notes the *Siravo* court's recitation of statutes using "cohabit" in the broad sense is somewhat one-sided. And, the court cites several cases for the proposition that " ' "[c]ohabitation means simply to live or dwell together in the same habitation; evidence of lack of sexual relations is irrelevant." ' [Citations.]" (17 Cal.App.4th at p. 561.) But in all of those cases the parties were living together as husband and wife. Still, Dunn's citation of instances where cohabit is used in the narrow sense is equally skewed.

[9]Even when the meaning of the words seems clear, the prevailing view is that legislative intent controls the construction of the statute (*Title Ins. & Trust Co.* v. *County of Riverside* (1989) 48 Cal.3d 84, 95 [255 Cal.Rptr. 670, 767 P.2d 1148]), at least where the vagueness of criminal statutes is not involved.

"cohabitant" than any court does when it attempts to ascertain legislative intent where the Legislature has not overtly expressed it.

The petition for writ is denied, the alternative writ is discharged, and this court's previously issued stay order is dissolved.

Moore, Acting P. J., and Sonenshine, J., concurred.

Petitioner's application for review by the Supreme Court was denied March 30, 1994.